346 S.E.2d 788

**McCULLOUGH OIL, INC., formerly known as McCullough Oil and Gas, Inc.**

v.

**William B. REZEK, et al.**

**No. 16593.**

Supreme Court of Appeals of West Virginia.

July 8, 1986.

Robert E. Cesner, Jr., Worthington, Ohio, for appellant.

Orville L. Hardman, Parkersburg, for appellee.

McHUGH, Justice:

This action is before this Court upon appeal by McCullough Oil, Inc., the plaintiff below (McCullough),[1] from a final order of the Circuit Court of Wood County, West Virginia, denying McCullough's motion for summary judgment as to liability and granting the defendants' motion for summary judgment. This case has been submitted on the petition, all matters of record and the briefs and oral argument of counsel. We affirm the ruling of the trial court.

## I

On February 25, 1966, Ohio River Sand & Gravel, a division of McDonough Co., executed a lease granting to McCullough oil and gas rights in certain real estate containing 110 acres, more or less, in Wood County, West Virginia, known as Neal Island. Under this oil and gas lease McDonough Co. granted a $7/8$ part interest to McCullough and reserved a $1/8$ part interest. The lease, as amended, contained these pertinent provisions:

> (2) It is agreed that this Lease shall remain in force for a primary term of eighty (80) days from this date and as long thereafter as operations for oil or gas are being conducted on the premises, or oil or gas is found in paying quantities thereon.
>
> . . . .
>
> (14) It is expressly agreed that if the Lessee shall commence drilling operations at any time while this Lease is in force, it shall remain in force and its terms continue so long as such operations are prosecuted, and if production results therefrom, then as long as production continues. If after the expiration of the [primary] term of this Lease, production from the leased premises shall cease from any cause, this Lease shall not terminate, provided Lessee resumes operations within sixty (60) days from such cessation, and this Lease shall

remain in force during the prosecution of. such operations, and, if production results therefrom, then as long as oil or gas is produced in paying quantities.

In April, 1966, McCullough assigned the lease to William B. Rezek. Under this assignment McCullough reserved a $1/32$ working interest in the $7/8$ lease (a $1/16$ working interest if production gross income would equal or exceed the total cost of a well). The assignment also provided that if the lease be abandoned for any reason by the assignee, his successors or assigns, then all right, title and interest in and to the lease shall revert to McCullough, without prejudice or encumbrance.

William B. Rezek assigned the lease in March, 1969, and after several mesne assignments, the lease was assigned to James V. Reynolds in July, 1977.

On March 24, 1980, James V. Reynolds executed a "Surrender of Lease" of the subject oil and gas rights to Ohio River Sand & Gravel, a division of McDonough Co. On March 25, 1980, Ohio River Sand & Gravel, a division of McDonough Co., executed an oil and gas lease on the subject property back to James V. Reynolds.

In December, 1980, McDonough Co. assigned its interest as lessor in the subject lease, and in January, 1981, Dravo Corporation obtained this interest as lessor by an assignment.

Within the primary term two wells were drilled and production therefrom was in paying quantities. According to the unopposed affidavits of two individuals familiar with Neal Island (one of whom had been an assignee of the lease) and according to the uncontroverted testimony of one of these individuals upon deposition, there was no activity or effort to produce oil or gas and there was no production at all during the years 1972 through 1978. According to the answer of Dravo Corporation, production from the wells commenced again in early July, 1981. No royalties or rentals were paid during the years of inactivity.

---

1. McCullough Oil, Inc. was formerly known as McCullough Oil and Gas, Inc.

In September, 1981, McCullough filed this action in the trial court. Although other defendants were named, the dispute is actually between McCullough on the one hand, as the original lessee, and, on the other hand, James V. Reynolds, as ultimate assignee of McCullough, and Dravo Corporation, as the current lessor. McCullough, claiming that Reynolds' surrender of the lease in March, 1980, constituted an abandonment triggering a reversion of the ⅞ lease to McCullough, brought this action to quiet title, for the appointment of a special receiver and an accounting, and for compensatory and punitive damages resulting from the alleged civil conspiracy of the defendants to deprive McCullough of its interest in the oil or gas production.

After reviewing the pleadings and affidavits and deposition, the trial court granted the defendants' motion for summary judgment and denied the plaintiff's motion for summary judgment as to liability. The trial court ruled that the lease (the operating interest) had initially "reverted" to McCullough, under the terms of its assignment to Rezek, upon abandonment resulting from complete cessation of production and lack of operations. The trial court further ruled that after "reverting" to McCullough, the lease expired by its own terms, thereby extinguishing McCullough's interest, due to cessation of production after the primary term without resumption of operations within sixty days as required by the lease. Finally, the trial court ruled, therefore, that this case did not involve a "forfeiture" for failure to perform a "condition," which, under the lease, would have required notice to McCullough or its assignees and the opportunity to correct the default.

On this appeal McCullough contends that paragraph number (5) of the lease, requiring notice and opportunity to cure (within ten days) a breach of a payment or performance condition, applies here, and since no notice of default in production or operations was given to McCullough or any of its assignees, no forfeiture of McCullough's interest in the lease resulted.[2]

## II

■ An oil and gas lease (or other mineral lease) is both a conveyance and a contract. It is designed to accomplish the main purpose of the owner of the land and of the lessee (or its assignee) as operator of the oil and gas interests: securing production of oil or gas or both in paying quantities, quickly and for as long as production in paying quantities is obtainable. Analyzed, an oil and gas lease contains traditional conveyancing portions and the usually separate contractual portions. *Montana-Fresno Oil Co. v. Powell*, 219 Cal. App.2d 653, 659, 33 Cal.Rptr. 401, 404 (1963).

One of the conveyancing portions of an oil and gas lease is the "habendum" clause, also known as the "term" clause. The purpose of the habendum clause in an oil and gas lease (or other mineral lease) is to define and limit the duration of the lessee's estate. R. Donley, *The Law Of Coal, Oil And Gas In West Virginia And Virginia* § 65a. (1951).[3] The habendum clause of

**2.** Paragraph number (5) of the lease states:

(5) All monies coming due hereunder shall be paid or tendered to Ohio River Sand and Gravel, Division of McDonough Co., and no default shall be declared against the Lessee by the Lessor for failure of the Lessee to make any payment or perform any conditions provided for herein unless the Lessee shall refuse or neglect to pay or perform the same for ten (10) days after having received written notice by registered mail from the Lessor of his intention to declare such default.

A subsequent, unnumbered paragraph of the lease, as amended, states:

In no event shall the income accruing to the Lessor by virtue of this Lease be in an amount less than Fifteen Hundred ($1500.00) Dollars a year for any year beginning one (1) year after the date that oil or gas is first produced or sold from said premises. Said Fifteen Hundred ($1500.00) Dollars shall be in the form of royalty or rental in the event that royalty does not equal Fifteen Hundred ($1500.00) Dollars per year. Should the income accruing to the Lessor in any year (either as royalty or rental) not equal Fifteen Hundred ($1500.00) Dollars, this Lease may be terminated by the Lessor.

**3.** *Habendum* is from the phrase *habendum et tenendum,* Latin for, "to have and to hold," used traditionally in deeds or other documents of conveyance to define the duration of the estate conveyed. *Black's Law Dictionary* 639 (5th ed. 1979).

virtually all contemporary oil and gas leases provides for a relatively short "primary" term, consisting of a fixed period of time of from a few months to five or ten years, at the end of which period there must be production (or in some leases, the prosecution of drilling operations); the habendum clause also provides that the lease may be preserved for an indefinite period of time beyond the expiration of the primary term "as long thereafter" as oil or gas is produced in paying quantities (or in some leases, for as long· thereafter as operations for oil or gas are being conducted). 3 H. Williams, *Oil And Gas Law* § 601.4 at 9–10 (1985). *See also* R. Donley, *The Law Of Coal, Oil And Gas In West Virginia And Virginia* § 69 (1951). Paragraph number (2) of the lease involved in this case, quoted *supra* in section "I" of this opinion, is the habendum clause of such lease.[4]

The modern habendum clause, with its short primary term and its "thereafter" provision, is designed to measure the duration of the oil and gas lease by its primary objective, the production of oil or gas. The clause seeks to assure the lessor that the leased premises will be put in production, from which the lessor will be paid a royalty, within the primary term or the lease will automatically terminate, either at the end of the primary term, or if there is then production, thereafter upon the cessation of production. The lessee is likewise notified upon the execution of the lease of the fixed time in which it must obtain production and is assured of keeping the lease as long as production continues (or in some leases, for as long as operations for production continue). 3 H. Williams, *Oil And Gas Law* § 604 at 41 (1985).

Many modern oil and gas leases (or other mineral leases) contain a "savings" clause called a "cessation of production" clause which, for example, modifies the "thereafter" provision of the habendum clause. Under the latter, as discussed *supra*, the lease automatically terminates immediately upon the cessation of production during the "secondary" term, that is, after the expiration of the primary term of the lease. A cessation of production clause applicable to the secondary term, extends a "grace" period to the lessee. It prolongs the life of the lease for a specified period of time (typically sixty or ninety days) after cessation of production "from any cause" during the secondary term, and if operations are resumed during such period of time, the lease will not terminate but will remain in force for as long thereafter as operations continue (and if production results therefrom, then as long thereafter as there is production in paying quantities). 3 H. Williams, *Oil And Gas Law* §§ 604.4 àt 66–67, 615.1 at 263–64 (1985). The second sentence of paragraph number (14) of the lease involved in this case, quoted *supra* in section "I" of this opinion, is the cessation of production clause of such lease.[5]

---

**4.** The habendum clause and other clauses in the modern oil and gas lease are designed to protect the interests of both the lessor and the lessee (or its assignee) as operator:

The modern oil and gas lease is the evolutionary product of conflicts between the landowner and the operator of the oil and gas interest. The operator has been desirous of securing a lease with. a small capital investment, keeping the lease as long as it was productive or was valuable for speculative purposes, and at the same time, being able to terminate an unprofitable lease without liability to the lessor. The landowner has been interested primarily in obtaining royalties from the lease and therefore has pressed for early exploration and development operations. In lieu of exploration and development operations, the lessor has tried to secure a periodic return for the holding of the leasehold interest. However, he has also wanted to limit the time the lessee can postpone drilling by periodic payments, in order to prevent the lessee from holding the lease merely for speculation, and to assure the exploration and development of the lease within a short time. These conflicts have been reflected especially by variant forms of the habendum clause and of the drilling and rental clause of oil and gas leases.

3 H. Williams, *Oil And Gas Law* § 601 at 2 (1985).

**5.** In the absence of a cessation of production clause, the courts in virtually all jurisdictions addressing the issue have developed a "temporary" cessation of production doctrine, whereby a mere "temporary" cessation of production during the secondary term for equipment repairs or technical problems, reworking operations, lack of a market, etc., does not result in an automatic termination of the lease, as these types of delays are normally not protracted and are incidental to the normal operation of the

A habendum clause in an oil and gas lease (or other mineral lease) providing for a short primary term and a secondary term for "so long as" production in paying quantities or operations therefor continue, or similar language, conveys a "determinable" interest, that is, an interest subject to a special limitation. Such an interest automatically terminates by its own terms upon the occurrence of the stated event, namely, expiration of the primary term without production or operations at such time, or the cessation of production or operations during the secondary term. Such a habendum clause does *not* convey an interest subject to a condition subsequent, with the lessor having the optionally exercisable power of declaring a forfeiture upon nonproduction or cessation of production. Instead, the lessor has a possibility of reverter and does not need to take any affirmative action for the lease to terminate. *See Valer Oil Co. v. Souza,* 182 Cal.App.2d 790, 797–99, 6 Cal.Rptr. 301, 307 (1960); *Dethloff v. Zeigler Coal Co.,* 82 Ill.2d 393, 400–02, 45 Ill. Dec. 175, 180–81, 412 N.E.2d 526, 530–31 (1980), *cert. denied,* 451 U.S. 910, 101 S.Ct.

1980, 68 L.Ed.2d 299 (1981); *Baldwin v. Blue Stem Oil Co.,* 106 Kan. 848, 850–51, 189 P. 920, 921–22 (1920); *Vaughn v. Hearrell,* 347 S.W.2d 542, 544 (Ky.1961); *Noel Estate, Inc. v. Murray,* 223 La. 387, 391, 65 So.2d 886, 888 (1953); *J.J. Fagan & Co. v. Burns,* 247 Mich. 674, 679–80, 226 N.W. 653, 655 (1929); *Schumacher v. Cole,* 131 Mont. 166, 172–73, 309 P.2d 311, 314–15 (1957); *Long v. Magnolia Petroleum Co.,* 166 Neb. 410, 422–23, 89 N.W.2d 245, 253–54 (1958); *Peckham v. Dunning,* 125 N.Y.S.2d 895, 899 (Sup.Ct.1953); *Hanna v. Shorts,* 163 Ohio St. 44, 49, 125 N.E.2d 338, 341 (1955); *Fremont Lumber Co. v. Starrell Petroleum Co.,* 228 Or. 180, 186, 364 P.2d 773, 775–76 (1961); *Brown v. Haight,* 435 Pa. 12, 17, 255 A.2d 508, 511 (1969); *Fox v. Thoreson,* 398 S.W.2d 88, 91–92 (Tex.1966). *See also* 2 E. Kuntz, *A Treatise On The Law Of Oil And Gas* § 26.4 at 253 (1964 and Cum.Supp.1986); 3 H. Williams, *Oil And Gas Law* § 604 at 41–42 (1985); 2 R. Powell, *The Law Of Real Property* paras. 187–88 (P. Rohan rev. ed. 1985). *But see Stewart v. Amerada Hess*

lease; they must, therefore, have been contemplated by the parties to be excusable. *See Anderson v. Schaffner,* 90 W.Va. 225, 229, 110 S.E. 566, 567 (1922). *See also* annot., 100 A.L.R.2d 885 (1965 and Later Case Service). Factors to be considered in deciding whether a cessation of production is "temporary" include the length of time without production, the cause of the delay and whether the lessee exercised reasonable diligence to resume production. *See Hutchinson v. McCue,* 101 F.2d 111, 120 (4th Cir.) (applying West Virginia law), *cert. denied,* 308 U.S. 564, 60 S.Ct. 75, 84 L.Ed. 473 (1939). *See also R. Donley, The Law Of Coal, Oil And Gas In West Virginia And Virginia* § 70 & n. 16 (1951); 3 H. Williams, *Oil And Gas Law* § 604.4 (1985).

On the other hand, where the lease contains a cessation of production clause, nearly all of the cases hold that the parties are bound by such clause's definition of a "temporary" cessation of production, and the imprecise common law doctrine of temporary cessation of production (which allows a "reasonable" period of time to resume operations) is not applicable to extend the lease beyond the precisely fixed "grace" period stated in the cessation of production clause of the lease. *See, e.g., Trinidad Petroleum Corp. v. Pioneer Natural Gas Co.,* 416 So.2d 290, 297–98 (La.Ct.App.), *cert. denied,* 422 So.2d 154 (La. 1982); *Lone Star Producing Co. v. Walker,* 257 So.2d 496, 501 (Miss.1971); *Greer v. Salmon,* 82

N.M. 245, 248, 479 P.2d 294, 297 (1970); *Hoyt v. Continental Oil Co.,* 606 P.2d 560, 563–64 (Okla. 1980); *Samano v. Sun Oil Co.,* 621 S.W.2d 580, 583–84 (Tex.1981); *Haby v. Stanolind Oil & Gas Co.,* 228 F.2d 298, 306 (5th Cir.1955) (applying Texas law).

In any event, the cessation of production in the case now before this Court was for an unreasonably long period of time, specifically, for a period of longer than nine years, without any attempted justification on the record for the failure to resume operations. The cessation of production was, therefore, not "temporary" even under the temporary cessation of production doctrine.

Similarly, the noncompliance with the sixty-day cessation of production clause of the lease in this case makes it unnecessary to decide whether the lease was subject to forfeiture due to "abandonment." *W.Va.Code,* 36–4–9a [1979] provides for a rebuttable presumption of intent to abandon an oil and gas lease, with certain stated exceptions, where there has been a failure to produce and sell or to produce and use for one's own purpose for a period of greater than twenty-four months (after July 1, 1979). For a discussion of this statute see *Berry Energy Consultants & Managers, Inc. v. Bennett,* 175 W.Va. 92, 95–98, 331 S.E.2d 823, 826–29 (1985). As discussed *infra* in the text, the lease involved here automatically expired at the end of the sixty-day period set forth in the cessation of production clause.

*Corp.,* 604 P.2d 854, 858 (Okla.1979). In short, by the self-executing terms of such a habendum clause, the lease terminates, expires or lapses; it is not forfeited. The distinction is not merely one of nomenclature. As a consequence of this distinction, the rule that equity abhors a forfeiture is not applicable. *See, e.g., Long v. Magnolia Petroleum Co., supra,* 166 Neb. 410, 423–24, 89 N.W.2d 245, 254 (1958).

█ As with the lack of production (or under some mineral leases, the lack of operations) at the end of the primary term, an oil and gas lease (or other mineral lease) automatically terminates immediately upon the cessation of production during the secondary term, unless there is a cessation of production clause, discussed *supra,* or in the absence of such a clause, unless the cessation of production is only "temporary," as discussed at n. 5, *supra. See Montana-Fresno Oil Co. v. Powell,* 219 Cal.App.2d 653, 659–66, 33 Cal.Rptr. 401, 404–09 (1963); *Gillespie v. Wagoner,* 28 Ill.2d 217, 219, 190 N.E.2d 765, 766 (1963); syl. pt. 9, *Reese Enterprises, Inc. v. Lawson,* 220 Kan. 300, 553 P.2d 885 (1976); *McQueen v. Sun Oil Co.,* 213 F.2d 889, 892 (6th Cir.1954) (applying Kentucky law); *CCH, Inc. v. Heard,* 410 So.2d 1283, 1285 (La.Ct.App.1982); *Miami Oil Producers, Inc. v. Larson,* 661 P.2d 1260, 1263 (Mont. 1983); *Kirby v. Holland,* 210 Neb. 711, 715, 316 N.W.2d 746, 750 (1982); *Wagner v. Smith,* 8 Ohio App.3d 90, 92, 456 N.E.2d 523, 525 (1982); *Woodson Oil Co. v. Pruett,* 281 S.W.2d 159, 164–65 (Tex.Civ. App.1955), *writ ref'd, n.r.e. See also* 2 E. Kuntz, *A Treatise On The Law Of Oil And Gas* § 26.8(c) (1964 and Cum.Supp.1986); 2 W. Summers, *The Law Of Oil And Gas* § 305 (1959 and Cum.Supp.1985); 3 H. Williams, *Oil and Gas Law* § 604.2 at 54–55 (1985).

█ Similarly, where an oil and gas lease (or other mineral lease) contains a cessation of production clause applicable to the secondary term, the lease terminates automatically at the end of the "grace period" provided by such clause, unless production or operations are resumed within the grace period. The cessation of production clause

grants the lessee the right to resume operations within the grace period; it does not impose the duty to do so. *Greer v. Salmon,* 82 N.M. 245, 248, 479 P.2d 294, 297 (1970).

The contractual portions of an oil and gas lease (or other mineral lease) set forth the covenants and duties of the parties. To avoid an inadvertent breach of contract and an unexpected cancellation of the lease, a clause is often inserted in an oil and gas lease (or other mineral lease) which requires that the lessor give notice of specified duration to the lessee before the lease can be cancelled or forfeited for breach of the lessee's duties. Such a clause is called a "notice and demand" clause. Paragraph number (5) of the lease involved in this case, quoted *supra* at n. 2, is the notice and demand clause of such lease.

█ A notice and demand clause in an oil and gas lease (or other mineral lease) has no effect upon the habendum clause or cessation of production clause of the lease. Ordinarily a notice and demand clause relates to express and implied contractual obligations (covenants) of the lessee under the lease and relates to forfeiture of the lease for a default, that is, for a breach of these obligations; the notice and demand clause does not relate to termination or expiration of the lease upon the occurrence of the estate-limiting event stated in the habendum clause or cessation of production clause. Consequently, a notice and demand clause does not convert a determinable interest under the habendum clause or cessation of production clause into an interest subject to a condition subsequent, specifically, subject to the receipt of notice that the lease is about to expire due to the expected nonproduction (at the end of the primary term) or the expected lack of resumption of operations (after cessation of production during the secondary term). The lessee is under no obligation, for example, to resume operations after cessation of production during the secondary term but may elect to permit the lease to expire automatically without any "default" or breach of contract. Thus, the lessee (or its assignee as operator) is not entitled to no-

tice before the lease terminates automatically under the habendum clause or the cessation of production clause of an oil and gas lease (or other mineral lease). Furthermore, once the lease automatically terminates, requiring notification of the lessee would be a superfluous act, for the lessee could not unilaterally revive the lease. *See Renner v. Huntington-Hawthorne Oil & Gas Co.,* 39 Cal.2d 93, 98, 244 P.2d 895, 898–99 (1952); *Montana-Fresno Oil Co. v. Powell,* 219 Cal.App.2d 653, 665–66, 33 Cal. Rptr. 401, 408–09 (1963); *Valer Oil Co. v. Souza,* 182 Cal.App.2d 790, 798–99, 6 Cal. Rptr. 301, 307–08 (1960); *Dethloff v. Zeigler Coal Co.,* 82 Ill.2d 393, 402–04, 45 Ill. Dec. 175, 180–81, 412 N.E.2d 526, 531–32 (1980), *cert. denied,* 451 U.S. 910, 101 S.Ct. 1980, 68 L.Ed.2d 299 (1981); *Gillespie v. Wagoner,* 28 Ill.2d 217, 220–21, 190 N.E.2d 765, 767 (1963); *Logan v. Blaxton,* 71 So.2d 675, 679 (La.Ct.App.), *cert. denied* (1954); *Miami Oil Producers, Inc. v. Larson,* 661 P.2d 1260, 1263–64 (Mont.1983); *Greer v. Salmon,* 82 N.M. 245, 249–51, 479 P.2d 294, 298–300 (1970); *Fremont Lumber Co. v. Starrell Petroleum Co.,* 228 Or. 180, 188–90, 364 P.2d 773, 777–78 (1961); *Waggoner & Zeller Oil Co. v. Deike,* 508 S.W.2d 163, 165–66 (Tex.Civ.App.1974), *writ ref'd, n.r.e.; Preston v. Lambert,* 489 S.W.2d 955, 957 (Tex.Civ.App.1973), *writ ref'd, n.r.e.; Lynch v. Southern Coast Drilling Co.,* 442 S.W.2d 804, 806–07 (Tex. Civ.App.1969); *Stephenson v. Calliham,* 289 S.W. 158, 159 (Tex.Civ.App.1926). *See also* 2 E. Brown, *The Law Of Oil And Gas Leases* § 16.03(4) at 16–114 (2d ed. 1985 rev.); R. Hemingway, *The Law Of Oil And Gas* § 6.4 at 296 (2d ed. 1983); 2 E. Kuntz, *A Treatise On The Law Of Oil And Gas* §§ 26.4 at 253–54, 26.13(e) at 321 (1964 and Cum.Supp.1986); 3 W. Summers, *The Law Of Oil And Gas* § 469 at 367 & n. 82 (1958 and Cum.Supp.1985); 3 H. Williams, *Oil And Gas Law* § 604 at 45–46 (1985); 4 H. Williams, *Oil and Gas Law* § 682.2 at 354.2–357 (1985).

**6.** It is not necessary to discuss the distinctions between an "unless" lease and an "or" lease in this case because there was production in this case at the end of the primary term extending the lease into the secondary term, and the distinctions between "unless" and "or" leases relate

In a related context, this Court recently held that certain statutory notice and demand requirements did not apply to preclude the automatic termination of an oil and gas lease resulting from the lessee's failure to drill or pay delay rentals (during the primary term), pursuant to an "unless"-type drilling/delay rental clause. Syl. pt. 2 (in part), *Warner v. Haught, Inc.,* 174 W.Va. 722, 329 S.E.2d 88 (1985). In that case we remarked: "[T]here is a distinct notion of inconsistency in requiring, in a lease which obligates the lessee to do nothing, notice and demand before *automatic* termination." (emphasis in original) *Warner v. Haught, Inc.,* 174 W.Va. 722, 729, 329 S.E.2d 88, 95 (1985).[6]

An important public policy is promoted by construing the "thereafter" provision of the habendum clause and a cessation of production clause of an oil and gas lease (or other mineral lease) as conveying an interest which automatically terminates without prior notice:

> The language of th[ese] clause[s] clearly supports this construction. Furthermore, this construction seems in accord with the intent of the parties and sound policy. Upon termination of the lessee's estate, he is relieved of further obligations under the covenants of the lease.

> The primary purpose of the lease clearly is to obtain production. It would, therefore, seem in accord with this objective as embodied in the language of the habendum clause that the duration of the lessee's interest, after a period of exploration, be limited by the continued use of his interest for the purpose for which that interest was created. While the courts may be generally opposed to a construction that results in an automatic termination, the policy behind this rule is not applicable to an oil and gas lease. The special limitation placed on the duration of the lessee's interest is not a friv-

only to the manner in which the lease is terminated before the expiration of the primary term. For an analysis of "unless" and "or" leases see *Warner v. Haught, Inc.,* 174 W.Va. 722, 725–727, 329 S.E.2d 88, 92–94 (1985).

olous collateral condition or a whimsical limitation on the use of the interest. Furthermore, the limitation placed upon the lessee's interest is in accord with public policy, since upon the termination of the lessee's interest, new arrangements may be made for the development and production of the natural resources. The characterization of the 'thereafter' clause as a special limitation is also desirable in that the parties can usually proceed with certainty as to whether the lease has terminated or not.

... Equitable rules against forfeiture have no application when the 'thereafter' clause is characterized as a special limitation; if equitable factors are introduced to mitigate harsh results, uncertainty is created, and the primary objective of the lease, the production of oil or gas, may be subverted. (footnotes omitted)

3 H. Williams, *Oil And Gas Law* § 604 at 44–45 (1985). *Cf. Goodwin v. Wright*, 163 W.Va. 264, 267–68, 255 S.E.2d 924, 926 (1979) (emphasizing the importance of production and development).

 Applying these principles to the facts herein, we agree with the trial court that the lease in this case expired by its own terms upon McCullough's (or its assignee's) failure to resume operations within sixty days after production ceased during the secondary term of the lease. No default or forfeiture resulted, and McCullough was not entitled to notice under paragraph (5) of the lease that production had ceased.[7]

### III

Accordingly, the trial court properly granted the defendants' motion for sum-

mary judgment under *W.Va.R.Civ.P.* 56.[8] The governing principle is stated in the sole syllabus point of *Bell v. West*, 168 W.Va. 391, 284 S.E.2d 885 (1981):

'A movant is entitled to summary judgment where the facts established show a right to judgment with such clarity as to leave no room for controversy and show affirmatively that the adverse party cannot prevail under any circumstances.' Syl. Pt. 1, *George v. Blosser*, 157 W.Va. 811, 204 S.E.2d 567 (1974), *quoting, Hanks v. Beckley Newspapers Corp.*, 153 W.Va. 834, [837,] 172 S.E.2d 816 [, 818] (1970).

The briefs of McCullough submitted to this Court indicate that there was no marketing of production. The implication is that there was no cessation of production, only the lack of marketing. However, it is uncontroverted on the record that there was a complete cessation of production for more than nine years. Syllabus points 2 and 3 of *Guthrie v. Northwestern Mutual Life Insurance Co.*, 158 W.Va. 1, 208 S.E.2d 60 (1974), are dispositive:

2. Under the provisions of Rule 56 of the West Virginia Rules of Civil Procedure, when the moving party presents depositions, interrogatories, affidavits or otherwise indicates there is no genuine issue as to any material fact, the resisting party to avoid summary judgment must present some evidence that the facts are in dispute.

3. Summary judgment cannot be defeated on the basis of factual assertions contained in the brief of the party opposing a motion for such judgment.

7. McCullough certainly became aware of cessation of production many years prior to this litigation, for it did not receive any overriding royalties during the period of inactivity.

8. *W.Va.R.Civ.P.* 56 provides, in pertinent part:

. . . .

(e) *Form of affidavits; further testimony; defense required.*—Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof re-

ferred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

**648**

*See also* syl. pt. 2, *Hamon v. Akers,* 159 W.Va. 396, 222 S.E.2d 822 (1976); syl. pts. 4–5, *Burns v. Cities Service Co.,* 158 W.Va. 1059, 217 S.E.2d 56 (1975). The "brief" referred to in syllabus point 3 of *Guthrie* is a brief submitted to the trial court or to this Court on appeal.

Based upon all of the above, the final order of the trial court is affirmed.

Affirmed.